MANUELA QUIALA, Individually and as Mother and Natural Guardian of ROY MEARES and Another, Infants, et al., Respondents, v LAJOS LAUFER, Appellant.

First Department, May 14, 1992

## APPEARANCES OF COUNSEL

*Harry L. Klein* of counsel *(Jeffrey Kramer* with him on the brief; *Klein & Rosenzweig,* attorneys), for appellant.

*Steven Sarshik* for respondents.

## OPINION OF THE COURT

Ross, J.

On this appeal, we are called on to decide whether the mother of the infant grandchildren of the tenant of record in a rent-stabilized apartment is entitled to a renewal lease, solely on behalf of the children, upon said tenant's death. For at least two years prior to the tenant's death, the children spent the majority of their time in the subject Manhattan apartment, and the children's mother, who did not relinquish custody of, or responsibility for her children in any way, maintained her primary residence with her husband in Brooklyn, New York. The IAS court initially determined, *inter alia,* that the primary residence of the children was the subject apartment and that their mother Manuela Quiala was entitled to a renewal lease pursuant to Rent Stabilization Code (9 NYCRR) §§ 2523.5 and 2520.6 (o), solely on their behalf. Thereafter, defendant's motion for reconsideration of the IAS court's decision was denied, as was defendant's later motion for reargument of plaintiffs' application for attorney's fees, and a judgment for the amount of the attorney's fees was then entered. We disagree with the IAS court's determination of the primary residence issue, reverse the orders appealed from, and vacate the judgment accordingly.

In 1972, May Quiala, also known as May Gordon, occupied the subject apartment, number 6-F at 139 West 82nd Street in Manhattan, pursuant to a written lease prepared by the corporate landlord, 139 West 82nd Street Corporation. Subsequently, defendant Lajos Laufer purchased the building and, because Mrs. Gordon was a rent-stabilized tenant, periodically renewed her leases in accordance with the Rent Stabilization Code. Pursuant to the most recent renewal lease Mrs. Gor-

don's tenancy was to expire on July 31, 1990. However on January 11, 1990 Mrs. Gordon died.

On March 27, 1990, Manuela Quiala-Meares, Mrs. Gordon's daughter, commenced the action which gave rise to this appeal on her own behalf, and on behalf of two of her children, Roxanne and Roy Meares, as their mother and natural guardian. Plaintiffs sought a declaratory judgment declaring that they were the lawful tenants of the apartment, that the lease was extended to July 31, 1992, and that they be designated on the lease as tenants. The complaint also sought a mandatory injunction ordering the defendant to provide the plaintiffs with a signed lease and ordering the landlord to comply with the Rent Stabilization Code.

The matter was tried in an IAS Part of the Supreme Court, without a jury. Plaintiff Manuela Quiala-Meares testified that in 1979 her mother, Mrs. Gordon, purchased a house located at 96 Winthrop Street in Brooklyn. That same year Manuela Quiala moved into the house with her second husband Ed Meares, and her three children, Roy Meares, Roxanne Meares and Stanislas Hilton. In 1981, Manuela along with her three children, Roy, Roxanne and Stanislas, moved from the 96 Winthrop Street house to Mrs. Gordon's apartment on 82nd Street. In 1984, Mrs. Gordon transferred title to the Winthrop Street house to Manuela. In 1985, Manuela and Ed Meares divorced with Manuela retaining custody of the children. On August 25, 1989 Manuela married Mamadou Cisse Faye, her third husband. Shortly after the marriage Manuela and her new husband moved into the Winthrop Street house in Brooklyn. Manuela maintained, however, that Roxanne and Roy continued to live with their grandmother in the subject apartment on 82nd Street. According to Manuela, upon her mother's death, she returned to the subject apartment and has continued to reside there with her children ever since. The eldest child Stanislas Hilton is not involved in this action.

The trial court determined, based upon the testimony and documentary evidence, which included immigration papers, tax returns, a marriage license and affidavits filed in various divorce proceedings, that the subject apartment was not the primary residence of Manuela Quiala-Meares, for the full two-year period preceding Mrs. Gordon's death. That determination is supported by overwhelming evidence in the record and accordingly is not challenged by the defendant-appellant on appeal. However, with respect to the children, Roxanne and Roy, the court determined that the plaintiffs' evidence estab-

lished that the infant children's primary residence had been the subject apartment for well over two years prior to their grandmother's death, and that therefore their mother Manuela Quiala-Meares was entitled to a renewal lease, solely on their behalf.

The children's testimony was, in substance, that they lived with their maternal grandmother in the 82nd Street apartment since 1981, attended public school in Manhattan, and only occasionally stayed at the Winthrop Street house in Brooklyn during brief visits which occurred on weekends and during summer vacations. The children's testimony was also corroborated by Mrs. Gordon's nephew, who regularly visited his aunt. In contrast to the testimonial evidence was documentary evidence, which consisted chiefly of the children's school and hospital records and which evidenced that the children used the Winthrop Street, Brooklyn, address where their mother resided for certain purposes and used the 82nd Street Manhattan address for other purposes. It would appear to be significant that Roxanne acknowledged that the home address she entered on a recent school emergency form was the Brooklyn address. Further, the record indicates that Roxanne's report card indicated 15 absences and 19 days late, and Ms. Quiala-Meares wrote in "incorrect" for both figures, signed same, and gave her Brooklyn telephone number. Further Roxanne acknowledged that she inserted the Brooklyn address on her application to take the SAT examination.

The evidence, particularly the testimony of Manuela Quiala-Meares and of the children, conclusively established that at no time did Manuela Quiala-Meares relinquish custody or parental control over the two children, even though she contended that they lived with their maternal grandmother full time. In fact it was plaintiffs' position that Manuela maintained her parental authority and control at all times.

It is an established presumption that the residence of the child is the residence of the parents *(Catlin v Sobol,* 77 NY2d 552, 559; *Matter of Stillman v School Dist.,* 60 Misc 2d 819, *affd on opn at Special Term* 34 AD2d 553). " ' "Th[e] presumption may be overcome by proof showing that the parties have surrendered parental control and that such control is being exercised by some other person with whom the child [lives]" ' "*(Catlin v Sobol, supra,* at 559).

*Catlin v Sobol (supra)* concerned the obligation of a school district to furnish tuition-free education to a mentally handi-

capped child whose parents resided outside of the district and who was cared for at the parents' expense in a family "home at board" located within the district. The court determined, *inter alia,* that although the parents delegated the child's day-to-day care to the providers of the group home, they retained complete legal authority over him and could revoke or modify the terms of the group home's custody arrangement at any time, so that it could not be said that as a matter of law the child's permanent residence was the group home. Based on that conclusion, the court upheld as rational the Commissioner of Education's determination that the presumption, that the child's residence is that of the parents, was not rebutted, and that the group home was not the child's "actual and only residence" for the purposes of the Education Law. The court specifically declared the child not to be a resident of the school district in which the group home was located.

While *Catlin v Sobol (supra)* involves different facts and different policy considerations, it is instructive. Moreover it demonstrates, in a more compelling situation than that presented here, that the presumption concerning the residence of the child is not easily rebutted, and should not be lightly cast aside.

Rent Stabilization Code § 2523.5 (b), which requires a landlord to offer a renewal lease to members of a departed tenant's family under certain specified conditions is remedial in nature, and was included in the Code to prevent the harm that would ensue from the wholesale eviction of family members previously permitted under prior existing law as set forth in *Sullivan v Brevard Assocs.* (66 NY2d 489; *Lesser v Park 65 Realty Corp.,* 140 AD2d 169, 173, *lv dismissed* 72 NY2d 1042). Rent Stabilization Code § 2520.6 (o), in its listing of family members who can succeed to a departing tenant's rights by virtue of their having lived with the departed tenant for the required amount of time, does not differentiate between infants and adults.

There have been situations where succession has been allowed although the family member residing in the apartment is below the age of majority. For example, in *Doubledown Realty Corp. v Harris* (128 Misc 2d 403) a fifteen-year-old grandson was protected from eviction from his grandmother's apartment by section 56 (d) of the former New York City Rent and Eviction Regulations, because he lived with the statutory tenant for numerous years prior to her death and his mother, the tenant's daughter, visited the apartment only sporadically

over the years. While there was no discussion in that case of whether the child's mother had relinquished parental responsibility, the clear indication is that his grandmother had raised him and that the subject apartment was his home. This case does not present a situation which warrants similar treatment.

Plaintiffs' position has always been that Manuela Quiala-Meares maintained parental authority and control with respect to the infants at all times. While the children may spend a majority of their time at the 82nd Street apartment, their mother was a consistent presence in their lives and in no way relinquished responsibility for them. Therefore this case is unlike *Doubledown Realty Corp. v Harris (supra),* where the indication was that the mother had allowed the child's grandmother to raise him.

We believe it is significant in the matter before us, that the children were attending a school close to their grandmother's home. It has not been unusual in New York City, for parents to seek an address change for their children, so that they may attend a "more desirable" or "specialty school". Here the children attended a "magnet school" in Manhattan.

*Batsikas v Ligouri* (150 Misc 2d 377) involved a situation where a nephew was raised from infancy by a paternal aunt and uncle. The nephew first resided in apartment number A43 in the subject rent-controlled building, and later resided with the aunt's mother in apartment A32 in the same building from 1980 until great aunt's death in 1987, whereupon he continued to reside in the apartment. The trial court (New York City Civil Court, Kings County) found that the respondent nephew was a member of the great aunt's family who had been living with her from 1980 to 1987 as a family unit, and was therefore protected against eviction.

The decision in *Batsikas (supra)* concentrated only on the issue of whether the grandnephew, who was not adopted by the aunt and uncle, could be considered a "family member" of the great aunt for the purpose of the New York City Rent and Eviction Regulations. Moreover it was specifically concluded that the nephew lived in the apartment as his primary residence having obtained telephone service in his name and received his mail there. Therefore, it appears that the nephew was an adult during the period when he resided in the subject apartment and that the issue of the nephew's primary residence was not at all strongly contested. The situation pre-

sented in this case is distinguishable because the children are infants, whose primary residence is tied to the individual adult under whose parental authority and control they are raised.

The issue here is not, as plaintiffs would have it, whether the infants, could under any circumstances succeed to a family member's interest in a rent-stabilized apartment. Rather the issue is whether infants, who live for a large part of the time with a family member who has not assumed parental responsibility, either for convenience such as attendance at a particular school or other reasons, should be the vehicle through which the individual who has retained parental authority succeeds to the de facto custodial family member's interest in a rent-stabilized apartment.

This is not a situation where the family of the deceased tenant will be put out with no other housing option. Moreover, the goals and purposes of the Rent Stabilization Code will not be offended if the requested relief is denied. Manuela Quiala-Meares owns what is, for all intents and purposes, the family home in Brooklyn. The children belong with her in that home; she has no right to her mother's leasehold interest in the 82nd Street apartment by virtue of the fact that her children may have lived there for a part of the time. Moreover, since Ms. Quiala-Meares has in no way relinquished her parental responsibility for, or her authority over, her infant children, the subject apartment cannot be declared to be their primary residence.

Accordingly, the decision and order of Supreme Court, New York County (Carol H. Arber, J.), entered on or about February 5, 1991 is reversed, on the law and the facts, the order of the same court and Justice entered July 1, 1991 which awarded plaintiffs counsel fees is also reversed, and the judgment of the same court and Justice entered September 27, 1991 is vacated, without costs.

MURPHY, P. J., ROSENBERGER, ELLERIN and RUBIN, JJ., concur.

Decision and order of Supreme Court, New York County, entered on or about February 5, 1991 is reversed, on the law and the facts, the order of the same court and Justice entered July 1, 1991 which awarded plaintiffs counsel fees is also reversed, and the judgment of the same court and Justice entered September 27, 1991 is vacated, without costs.